**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARLENE R. MCWREATH, ROBERT C. MCBRIDE, KAREN LUNDIN and DEBORAH L. MCWREATH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 13-560 |
| RANGE RESOURCES – APPALACHIA, LLC, | ) ) ) | Judge Nora Barry Fischer |
| Defendant. | ) | |

**MEMORANDUM OPINION**

I. INTRODUCTION

This case involves disputes surrounding Plaintiffs Darlene McWreath, Robert McBride, Karen Lundin and Deborah McWreath's ("Plaintiffs") ownership of a percentage of subsurface oil and gas rights underlying real property located in Washington County, Pennsylvania and certain agreements they have with Defendant Range Resources Appalachia, LLC ("Range"). (Docket No. 1). Plaintiffs initially brought claims of conversion, trespass and accounting against Range but have now conceded their conversion and trespass claims, leaving only an accounting claim in this action. (*See* Docket No. 37). Presently before the Court are cross motions for summary judgment filed by the parties arguing the sufficiency of the remaining accounting claim. (Docket Nos. 28, 31). After careful consideration of all of the parties' arguments and the transcript of the July 11, 2014 oral argument, (Docket No. 41), and for the following reasons, Range's Motion for Summary Judgment [28] is granted and Plaintiffs' Motion for Summary Judgment [31] is denied.

## II. FACTUAL BACKGROUND

Plaintiffs own an undivided partial interest in the oil and gas underlying approximately 1,700.485 acres of real property in Washington County, Pennsylvania.  (Docket Nos. 30 at ¶¶ 1-2; 33 at ¶ 1).  They inherited said subsurface rights as the heirs of the Estate of David R. McWreath, their father ("the Estate").  (Docket Nos. 30 at ¶¶ 6-7; 33 at ¶ 1).  Plaintiffs own a thirty-three percent (33%) interest in the oil and gas in 1,332.485 acres of the property and a sixty-six percent (66%) interest in the oil and gas in the remaining 368 acres of the property.  (Docket No. 30 at ¶ 10; 28-2 at ¶ 7).  Plaintiffs admit that they have no ownership interests in the surface rights in the real property and have never even attempted to enter the surface of the property.  (Docket Nos. 30 at ¶¶ 3-4; 37 at ¶ 1; 28-8, *Dar. McWreath Depo* at 10; 28-9 *McBride Depo* at 7-8; 28-10, *Lundin Depo* at 11-14; 28-11, *Deb. McWreath Depo* at 7-8).  Further, during all of the relevant events in question, the surface and subsurface estates have been severed. (*See* Docket No. 30 at ¶¶ 2-4).

On September 20, 2007, the Estate entered into an "Oil and Gas Lease, Non-Surface Development" with Fortuna Energy, Inc., whereby the Estate granted Fortuna exclusive rights to explore, develop and produce the Estate's interests in the subsurface oil, gas and constituents thereof.  (Docket No. 28-2 at 1, ¶ 5). Specifically,

> Lessor hereby grants and leases exclusively to Lessee all oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the Leasehold, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure and market production from the Leasehold, using methods and techniques which are not restricted to current technology, including the exclusive right to conduct geophysical and other exploratory tests. For the purposes of this Lease, the term "gas" includes, but is not limited to, helium, carbon dioxide, gaseous sulfur compounds, methane produced from coal formations and other commercial gases, as well as normal hydrocarbon gases including casinghead

gas and all other gaseous substances.

(*Id.* at ¶ 1). In ¶ 2, the Lease defines the term "Leasehold" as the denoted lands located in the Towns of Hanover and Jefferson, in Washington County, sets forth the boundaries of the property and is "described for the purposes of this Lease as containing 1700.485 acres, more or less, including all contiguous, appurtenant, submerged or riparian lands owned or hereinafter owned by Lessor." (*Id.* at ¶ 2). In exchange, Fortuna agreed to pay the Estate an annual rental fee of $5.00 per mineral acre until the oil and gas are produced, at which time the Estate is entitled to royalty payments:

> in an amount equal to the current market value at the wellhead as and when produced of one-eighth (1/8th) of all oil, gas and the constituents thereof produced, saved, marketed and sold from the Leasehold. In no event shall the current market value be deemed to be in excess of the value actually received by the Lessee pursuant to a bona fide, arm's length sale or transaction. Lessee may withhold Royalty payments until such time as the total withheld exceeds twenty-five ($25.00) dollars.[1]

(*Id.*). The term of the lease is set forth as five years and continuing thereafter as long as any of a number of contingencies occurs including, among other things, if "a well capable of producing oil and/or gas is located on lands pooled, unitized or combined with all or a portion of the Leasehold." (Docket No. 28-2 at ¶ 3). The lessee was granted unrestricted rights to "pool or unitize all or any portion of the Leasehold with any other land or lands, whether contiguous or not contiguous, at any time before or after the drilling of a well so as to create one (1) or more drilling or production units." (*Id.* at ¶ 12). The disputed portion of the Lease provides that:

### 4. Non-Development Lease

Lessor and Lessee acknowledge and agree that Lessee is not

---

[1] The Lease also includes a "Shut-In Royalty" provision which is not in dispute in this case but generally sets forth the terms and conditions associated with the continuation of the Lease in the event that any wells are "shut-in, suspended, or otherwise not producing," and reverts the royalty due to the Estate in an amount equivalent to the rental rate in the event of such contingency. (Docket No. 28-2 at ¶ 6).

granted any right whatsoever: (i) to drill a well on any portion of the surface of the Leasehold; or (ii) install, construct or locate access roads or pipelines on any portion of the surface of the Leasehold. Accordingly, any lands that have been pooled, unitized or combined with all or a portion of the Leasehold in accordance with the terms of this Lease shall bear the burden of all surface development. Lessor does, however, acknowledge and provide its consent to the possibility that a wellbore may pass through or terminate below the surface of the Leasehold as a result of slant or directional drilling operations originating from a surface entry on lands nearby or adjacent to the Leasehold.

(Docket No. 28-2 at ¶ 4). Another provision, Lease Development, states that "[t]here is no express or implied covenant to develop the Leasehold within a certain timeframe, and there shall be no Lease forfeiture for an implied covenant to produce. The terms and conditions of this Lease constitute full compensation for the privileges granted by this Lease." (*Id.* at ¶14). The Notice provision provides that:

In the event Lessor considers that Lessee has not complied with any of its obligations under this Lease, Lessor shall notify Lessee in writing at the address set forth above, via certified United States mail, setting out specifically in what respects Lessor considers Lessee has breached this Lease (the "Notice"). Lessee shall then have sixty (60) days after receipt of the Notice within which to either: (i) meet or commence to meet all or any part of the breach or breaches alleged by Lessor, or (ii) provide an answer to Lessor outlining the reasons why, in its reasonable opinion, the breach or breaches alleged by Lessor have not occurred. Neither service of the Notice nor the doing of any act by Lessee aimed at meeting all or any part of the alleged breach or breaches as set forth in the Notice shall be deemed an admission or presumption that Lessee failed to perform any of its obligations under this Lease. Service of the Notice shall be precedent to the bringing of any action by Lessor on this Lease for any cause, and Lessor shall bring no such action until the lapse of sixty (60) days after service of the Notice on Lessee. In the event a matter is litigated and there is a final judicial determination that a breach or default occurred, this Lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after such final judicial determination to remedy the breach or default and Lessee fails to do so. Notwithstanding anything to the contrary contained in this Lease, this Lease shall not terminate or be subject to forfeiture or

cancellation if there is located on lands pooled, unitized, or combined with all or a portion of the Leasehold, a well capable of producing oil and/or gas, or on which Operations are being conducted and, in that event, Lessor's sole remedy for any default under this Lease shall be damages.

(*Id.* at ¶ 11).

The Lease was prepared on a "New York Oil and Gas Lease" form as clearly indicated on the bottom of each page. (Docket No. 28-2). Neither party took any discovery to determine the origin of the lease form. Further, despite this indication, there is no choice of law clause or designation of New York law as applying to interpret or construe the terms and conditions therein. (*Id.*). Only three standard provisions bear on interpretation/construction of the Lease: 17. "Entire Agreement"; 20. "Headings"; and 21. "Severability". (*Id.* at ¶¶ 17, 20, 21). Relevant here, the Headings provision states that "[t]he headings contained in this Lease are inserted for convenience of reference only and shall not affect the interpretation or construction of any provision herein." (*Id.* at ¶ 20).

Two of the Plaintiffs, Darlene McWreath and Robert McBride, executed the lease on behalf of the Estate in their roles as executor and executrix of the Estate. (Docket Nos. 28-2 at 6). The parties agree that Fortuna Energy subsequently assigned its rights in the lease to Range and that the Plaintiffs inherited the Estate's rights in the lease. (Docket Nos. 28 at ¶ 2; 37 at ¶ 2). The record is undisputed that Range has made payments to the McWreaths under the Lease, although the McWreaths may not have cashed the checks sent to them. (Docket No. 49 at 12). It is also uncontested that the McWreaths have not served the required Notice on Range outlining any defects in Range's performance of its obligations under the Lease and have consistently stated throughout this litigation that they are not presently suing Range for breach of contract. (*See* Docket Nos. 32, 37, 40, 42).

In 2011, Range presented each of the Plaintiffs with identical surface consent agreements authorizing Range to drill wells on the surface of the real property located directly above their interests in the subsurface oil and gas estate. (Docket Nos. 28-4:28-7). The relevant portions of these identical agreements state that:

> WHEREAS, the undersigned is the owner of property subject to that certain oil and gas lease executed by Estate of David R. McWreath, Executors: Darlene R. McWreath and Robert C. McBride… to Fortuna Energy Inc., dated September 20, 2007 and recorded in instrument #200814687 of the Deeds Records of Washington County, Commonwealth of Pennsylvania; and;
>
> WHEREAS, it is the intent of the undersigned to evidence the approval to RANGE RESOURCES-APPALACHIA, LLC of the well site(s), associated production equipment, access road(s), and pipeline(s) to be utilized by RANGE RESOURCES-APPALACHIA, LLC in conducting operations under the above referenced lease, and;
>
> WHEREAS, the aforesaid location(s) shown on the Well Location Plat(s) of McWreath Units #1H, #2H, #3H, #4H, #5H, #6H, #7H, #8H, #9H, #10H, #11H, #12H, #13H, #14H, #15H, and #16H well(s) attached hereto as "EXHIBIT A".
>
> NOW THEREFORE, In consideration of the payment of One ($1.00) Dollar and in consideration of the premises set forth herein, the undersigned parties to hereby consent to ratify and approve the location of the well site(s) associated production equipment, access road(s) and pipeline(s), as indicated on the plat attached as Exhibit A.

(Docket Nos. 28-4:28-7). The Well Location Plats showing the location of each of the 16 proposed wells #1H through #16H on the surface of real property are attached to each of the agreements. (*Id.*). Each of the plats identifies Starvaggi Industries as the surface owner of the land. (*Id.*).

The parties agree that each of the Plaintiffs separately executed the Surface Consent agreements. (Docket Nos. 30 at ¶¶ 14; 33 at ¶¶ 4-5). However, Plaintiffs argue that they were

misled or fraudulently induced by Range to enter into such agreements because: they did not understand the terms of the agreements; were unaware of the fact that the location of the wells was located directly above the subsurface rights they owned; and did not appreciate that the agreement purported to amend the earlier Lease. (Docket No. 33 at ¶6). Darlene McWreath testified that she signed the surface consent agreement at the behest of landman Kevin Mastrangelo[2] from Range because he advised that all of the interested property owners were signing such agreements and they needed to be executed prior to any production of oil and gas under the lease. (Docket No. 34 at 53-58). She also testified that she received the document in the mail and called Range. (*Id.* at 53). Kevin then immediately drove to meet her at her office and arrived in a few minutes. (*Id.*). Darlene McWreath admitted that she was not forced to sign the documents. (*Id.*). She added that she told Kevin that she was not prepared to sign the agreement that day but "after chitchatting with him, I did. I did sign it. I didn't date it, I just signed it. After talking with him, he made me feel like, you know, it wasn't that big a deal and this is what we do." (*Id.* at 20). Robert McBride also spoke to Kevin prior to signing the document and Kevin told him that the document was "just a formality" to allow Range to put some infrastructure on the surface of the property. (*Id.* at 12). The other Plaintiffs explained that they signed at the behest of their siblings/Plaintiffs. (*Id.* at 52).

On May 24, 2012, Range designated the location of wells on the surface of the property, naming them "McWreath Units #3H and #8H" and then recorded the location of the wells with the Recorder of Deeds of Washington County. (Docket No. 30 at ¶ 22). Range subsequently recorded an "Amended Designation of Unit - McWreath Unit 3H & 8H" with Washington

---

[2]    Ms. McWreath could not recall Kevin's last name during her deposition. (*Id.* at 53-54). After reviewing the documents during the motion hearing, the Court and the attorneys all agreed that "Kevin" was likely Kevin Mastrangello who had notarized the surface consent agreements and was located after an Internet search as an employee of Range. (Docket No. 49 at 38-40).

County dated July 9, 2012. (Docket No. 34 at 34-45). Such document expressly refers to the McWreaths, and the attached plats identify the McWreaths as lessors and Starvaggi as the surface owner. (*Id.*).

It is undisputed that separately from its interactions with Plaintiffs, Range entered into leases with all of the other partial mineral owners in the subsurface oil and gas and has now fully leased one-hundred percent (100%) of the oil and gas interests in the subject property.[3] (Docket No. 30 at ¶¶ 18- 19). Range also entered into a surface consent agreement with the surface owner of the property, Starvaggi, which provides that Range is permitted: entry onto the surface of the property; to drill wells on the surface of the property; and to use the surface of the property for other oil and gas operations. (*Id.* at ¶¶ 20-21). Indeed, Starvaggi is both a cotenant in the oil and gas estate and the surface owner of the property. (Docket No. 49 at 26).

Subsequent to obtaining the aforementioned consent from all parties with interest in the subsurface and surface of the subject property, Range drilled and completed two horizontal Marcellus wells in the property that is subject to the Lease at McWreath Unit 3H and 8H wells. (Docket No. 28-3, *Affidavit of Jeffrey P. Kramer* at ¶ 15). The facts are likewise uncontested that "[w]ith the exception of the initial flow-back that is produced at the time Range completed the wells, neither well is currently producing oil and gas." (*Id.* at ¶16). As noted, Range has sent checks to Plaintiffs to compensate them under the Lease although the checks may not have been cashed at this point given the ongoing litigation. (Docket No. 49 at 12-13).

Plaintiffs each testified that the relief they are seeking in this lawsuit is a higher royalty

---

[3]    The Court notes that the documents demonstrate that the following individuals/entities entered into lease agreements with Range that affect the McWreath Units 3H & 8H: Estate of David R. McWreath; Marilyn M. Campbell; Geraldine A. Martin; BHCH Mineral, Ltd.; Fredericksburg Royalty, Ltd; Peacock Paradox, LLC; DFP Investments, Ltd.; FFP Investments, Ltd.; Dawiel, LLC; Prairie Mineral Company, LLC; Starvaggi Industries, Incorporated; William S. Burkland; and, Ianetti's Garden Center, Inc.. (Docket No. 34 at 34-41). Like Plaintiffs, Starvaggi and Ianetti's Garden Center both initially signed leases with Fortuna. (*Id.*).

for their oil and gas rights than that set forth in the Lease they inherited, (i.e., 1/8th of production for their portion of the property or 12.5%). (*See* Docket Nos. 28-8, Def. Ex. 7, *Dar. McWreath Dep.* at 6-7; 28-9, Def. Ex. 8, *McBride Dep.* at 5-6; 28-10, Def. Ex. 9, *Lundin Dep.* at 6; 28-11, Def. Ex. 10, *Deb. McWreath Dep.* at 5-6). They explained that they were aware that Range has entered into leases with higher royalty rates (up to eighteen and one half percent) and paid thousands of dollars in bonuses to other individuals in exchange for leases in the more recent past, in contrast to the lease the Estate entered into with Fortuna in 2007. (Docket Nos. 28-8, Def. Ex. 7, *Dar. McWreath Dep.* at 6-7; Docket Nos. 28-9, Def. Ex. 8, *McBride Depo* at 5-6).

III. PROCEDURAL HISTORY

Plaintiffs initiated this case by filing a Complaint against Range in Washington County and Range subsequently removed the case to this Court based upon diversity jurisdiction on April 18, 2013. (Docket No. 1). The Court established a deadline for the parties to amend pleadings and/or add parties to the litigation by July 15, 2013 and no such motions were filed. (Docket No. 9). After receiving an extension of time from the Court, the parties completed discovery by the Court's extended deadline of December 13, 2013 and requested that a summary judgment schedule be established.[4] (Docket Nos. 23, 24). The parties then jointly requested an extension of the summary judgment deadlines, which was granted by the Court. (Docket Nos. 26, 27).

Pursuant to this schedule, the parties filed cross motions for summary judgment,

---

[4] The parties participated in Early Neutral Evaluation with Hon. Thomas T. Frampton but he reported that the case did not resolve. (Docket No. 21). At the conclusion of discovery, the Court inquired via email whether the parties were interested in returning to Judge Frampton for a mediation or participating in a settlement conference with the Court, to which the parties responded by requesting that the Court set a deadline for them to decide whether to engage in further ADR after the summary judgments motions were fully briefed. (Docket No. 25). Counsel advised on May 28, 2014 that the parties did not believe that formal mediation prior to the Court's motion hearing would be helpful to settlement. (Docket No. 43). The parties were then ordered to advise the Court if the matter could be resolved during negotiations subsequent to the motion hearing to which the parties have not reported any resolution. Thus, the Court has not referred the case for further settlement negotiations and proceeds to decide the present motions.

supporting briefs, concise statements of material facts and appendices on March 31, 2014. (Docket Nos. 28-34). Responses were later filed by both parties on April 30, 2014. (Docket Nos. 36-38). Replies followed from the parties on May 14, 2014. (Docket Nos. 39, 40). The briefing concluded with the parties submitting sur-reply briefs on May 28, 2014. (Docket Nos. 42, 43).

As noted above, oral argument was held on July 11, 2014 and the official transcript of such proceeding was filed on September 18, 2014. (Docket No. 41). Subsequent to oral argument, the parties filed supplemental briefs on September 2, 2014 and responses thereto on September 12, 2014. (Docket Nos. 45-48). To this point, Plaintiffs have not filed a formal motion to amend their complaint to include any additional causes of action against Range nor sought leave to do so *nunc pro tunc* following the expiration of the Court's deadline for amendment of pleadings by July 15, 2013.

As the present cross motions for summary judgment have been fully briefed and argued by the parties, they are now ripe for disposition.

## IV. LEGAL STANDARD

The legal standard governing motions for summary judgment is well-settled. To this end, Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine dispute of material

fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

V. DISCUSSION

As noted, Plaintiffs have conceded that summary judgment should be entered against them on their conversion and trespass claims alleging that Range trespassed on their partial oil and gas rights in the mineral estate they own in Washington County and converted their share of the oil and gas produced from the wells. (Docket Nos. 37, 42). Plaintiffs have acknowledged that such claims must be dismissed because their cotenants in the oil and gas estate have consented to Range both accessing the estate and producing the oil and gas therein. (*Id.*). Plaintiffs also admit that their remedy as an alleged non-consenting cotenant is limited to recovery of the value of the oil and gas produced from the estate in proportion to their share of

the oil and gas rights. (*Id.*). Hence, the remaining claim in dispute is Plaintiffs' accounting claim, which states, in total:

> 13. Plaintiffs are entitled to know of the volume of oil and/or gas removed from their property and the sums paid for the same.
>
> WHEREFORE, an accounting by [Range] itemizing the volumes of oil and/or gas removed from the Plaintiffs' Property and the monies received from the sale of the same are demanded.

(Docket No. 1). Plaintiffs' counsel explained that the purpose of seeking an accounting at this point was due to the expectation of future production of the oil and gas wells. He added, "[w]e simply want to have a mechanism in place to do the accounting on the original production at the proper computation and as new production comes in, be able to move forward without having to come back to court, argue all these issues again." (Docket No. 49 at 23-24).

The parties have considerably divergent positions as to the scope of the accounting claim and the relief sought by Plaintiffs in this case. (*See* Docket Nos. 29, 32, 36-42, 45-48). They also dispute the import of the initial Lease and subsequent surface consent agreement between the parties. (*Id.*). Range asserts that the Lease and surface consent agreements provide an affirmative defense to any accounting claim while Plaintiffs maintain that the Lease does not apply to the circumstances surrounding Range's drilling on the property because it is a "Non-Surface Development Lease" but Range has set up its drilling operation directly on the surface of the property above the subsurface oil and gas rights. (*Id.*). In making this argument, Plaintiffs reiterate that they are not alleging that the Lease has been breached by Range. (Docket Nos. 37, 42, 48). Instead, Plaintiffs seek to avoid the Lease and enforce common law rights they would otherwise have as non-consenting cotenants to the drilling conducted by Range. (*Id.*). Plaintiffs further argue that the surface consent agreements were executed due to alleged

misrepresentations made by Range to them.  (*Id.*).  Given the nature of the parties' disputes, the Court turns initially to the Lease, and begins by setting forth the applicable legal principles.

A. *Relevant Legal Principles as to Oil and Gas Leases*

With respect to choice of law, the Court questioned counsel at the motion hearing concerning the nature of the form agreement at issue and whether its references to New York law had any bearing on these disputes.  (Docket No. 49 at 27-33).  Through their supplemental briefs, the parties agree that Pennsylvania law should be applied to analyze their respective rights and duties under the Non-Surface Development Lease.  (Docket Nos. 45; 46).  The Court concurs with the parties that Pennsylvania law is appropriately applied given that this case surrounds oil and gas rights in property located within the Commonwealth.[5]  Accordingly, the Court will apply Pennsylvania law to interpret and construe the lease.

The instant Lease pertains to oil and gas drilling in the Marcellus Shale Formation, a large natural gas reservoir which has become active in the past decade due to the advent of "'unconventional' gas wells: hydraulic fracturing or 'fracking' […] and horizontal drilling." *Robinson Twp., Washington Cnty. v. Com.*, 83 A.3d 901, 914-15 (Pa. 2013) (citation omitted). Like the formation itself, the law of this Commonwealth governing such property rights is still largely in the development phase.  To this end, the Superior Court has recently noted that "[a]lthough the interpretation of oil and gas leases has proved to be troublesome for the courts of this Commonwealth, the law has developed to provide that an oil and gas lease, despite the use of the term 'lease,' actually involves the conveyance of property rights." *Nolt v. TS Calkins &*

---

[5]        The Court further notes that there was much discussion about the references to the New York General Obligations Law 15-304 contained on the Lease during the Motion Hearing with the Court questioning whether the provision at issue could result in termination and/or forfeiture of the Lease.  (Docket No. 49).  In their Supplemental Brief, Plaintiffs argue that the New York General Obligations Law 15-304 "is not a mechanism for terminating a lease.  The law is a mechanism for clearing up the title issues on the public records once a lease has terminated." (Docket No. 45 at 8).  Accordingly, as Plaintiffs have conceded this point, no further discussion is necessary.

*Assoc., LP*, 96 A.3d 1042, 1046 (2014) (citing *Szymanowski v. Brace*, 987 A.2d 717, 719-20 (Pa. Super. Ct. 2009)); *see also Sabella v. Appalachian Development Corp.*, 103 A.3d 83, 101-102 (Pa. Super. Cr. 2014) (citing *Hutchinson v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 387, n.1 (Pa. 1986)) (noting that use of the term lease has been referred to as a "misnomer"). Further, the Supreme Court of Pennsylvania has explained that:

> the title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development. If development during the agreed upon primary term is unsuccessful, no estate vests in the lessee. If, however, oil or gas is produced, a fee simple determinable is created in the lessee, and the lessee's right to extract the oil or gas becomes vested. A fee simple determinable is an estate in fee that automatically reverts to the grantor upon the occurrence of a specific event. The interest held by the grantor after such a conveyance is termed "a possibility of reverter."

*T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012) (internal citations omitted). "Additionally, the law of this Commonwealth is that one who has the right to remove subsurface minerals, also has the right to enter onto the surface and to make reasonable use of a portion of the surface to retrieve his property." *Humberston v. Chevron U.S.A., Inc.*, 2013 PA Super 238, 75 A.3d 504, 511 (Pa. Super. Ct. 2013) (citing *Belden and Blake Corporation v. Department of Conservation and Natural Resources*, 600 Pa. 559, 599, 969 A.2d 528 (2009)). "As against the owner of the surface, each of the several purchasers [of subsurface rights] would have the right, without any express words of grant for that purpose, to go upon the surface to open a way by shaft, or drift, or well, to his underlying estate, and to occupy so much of the surface, beyond the limits of his shaft, drift, or well, as may be necessary to operate his estate, and to remove the product thereof." *Id.* (quoting *Chartiers Block Company v. Mellon*, 25 A. 597, 598 (Pa. 1893)).

It is also the law of this Commonwealth that an oil and gas:

> lease is in the nature of a contract and is controlled by principles of contract law. It must be construed in accordance with the terms of

the agreement as manifestly expressed, and the accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement.

*T.W. Phillips*, 42 A.3d at 267.

In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Sw. Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 177, 187 (Pa. Super. Ct. 2013) (quoting *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509–10 (Pa. Super. Ct. 2013)). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.*, 77 A.3d 1, 6 (Pa. Super. Ct. 2013) (quotation omitted). "Where the language of the contract is ambiguous, the provision is to be construed against the drafter." *Id.* (quoting *State Farm Fire and Casualty Company v. PECO*, 54 A.3d 921, 928 (Pa. Super. Ct. 2012)).

Pertinent here, restrictions on the use of land are not favored under Pennsylvania law and provisions restricting the use of land are strictly construed against the party seeking to enforce such restrictions. *See Pocono Summit Realty, LLC v. Ahmad Amer, LLC*, 52 A.3d 261, 269 (Pa. Super. Ct. 2012) (internal citations and quotations omitted). In addition, "[c]ontractual conditions can relate directly to the existence of an actual agreement; however, such conditions usually deal with the parties' duties of performance." *Cardinale v. R.E. Gas Dev. LLC*, 74 A.3d 136, 141-42 (Pa. Super. Ct. 2013) (citing *Village Beer and Beverage, Inc. v. Vernon D. Cox and Co., Inc.*, 475 A.2d 117, 122 (1984) ("While conditions usually deal with duties of performance,

they may relate to the existence of contracts as well.")). Finally, "where an act or event mentioned in a contract is not expressly made a condition precedent, it will not be so construed unless such clearly appears to be the intention of the parties." *American Leasing v. Morrison Co.*, 454 A.2d 555, 559 (Pa. Super. Ct. 1982).

### B. Interpretation of the Lease

With these principles in mind, the Court turns to its analysis of the Lease. (*See* Docket No. 28-2). Initially, to the extent that Plaintiffs rely on the title of the Lease (i.e., "Non-Surface Development") and the heading of the disputed provision (i.e., ¶ 4.0 "Non-Development Lease"), in support of their interpretation of the Lease, neither are dispositive because the parties agreed at ¶ 20 that "[t]he headings contained in this Lease are inserted for convenience of reference only and shall not affect the interpretation or construction of any provision herein." (Docket No. 28-2 at ¶ 20). Hence, these agreed-upon rules of interpretation and construction must be given their full effect and the plain meaning of ¶ 20 directs the Court to focus on the body of the disputed provisions to determine their meanings. *See Sw. Energy Prod. Co.*, 83 A.3d at 187. Without these headings, Plaintiffs' argument relies on the language contained in ¶ 4 of the Lease. But, Pennsylvania law does not restrict the Court to reviewing that provision as the Lease must be viewed as a whole to reach a reasonable interpretation. *See id.*

Again, Plaintiffs' theory of recovery in this case revolves around complete avoidance of the Lease, i.e., that it does not apply to drilling being performed from the surface of the property. (Docket Nos. 37, 42). Since Plaintiffs admit that they signed the Lease and have not directly challenged its validity, they must demonstrate that the entire agreement is conditioned on the use of horizontal drilling from the surface of other property and/or that the language of ¶ 4 constitute conditions precedent to the other obligations in the Lease. In this Court's opinion, neither theory

is viable as the intent manifested by the parties through the plain meaning of the terms used in the Lease demonstrates that Range (through its predecessor Fortuna) was conveyed a broad grant of oil and gas rights which was not conditioned on the location of the well on the surface of the property. (*See* Docket No. 28-2 at ¶ 1). At most, the Lease contains an ambiguity between the broad grant of rights set forth in ¶ 1 and the subsequent limitation denoted in ¶ 4 but, even resolving this potential ambiguity in Plaintiffs' favor, the provisions can only be read as limitations on the scope of the grant of rights from Lessor (Plaintiffs) to Lessee (Range) and/or as contractual restrictions on the Lessee's (Range's) *performance* of obligations under the Lease. *Cf. Keystone Dedicated Logistics, LLC*, 77 A.3d at 6 (Pa. Super. Ct. 2013 (quoting *State Farm Fire and Casualty Company*, 54 A.3d at 928 ("Where the language of a contract is ambiguous, the provision is to be construed against the drafter.").

"Within the oil and gas industry, oil and gas leases generally contain several key provisions, including the granting clause, which initially conveys to the lessee the right to drill for and produce oil or gas from the property." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 615 Pa. 199, 209, 42 A.3d 261, 267 (2012). Thus, the granting clause specifies what rights are conveyed from lessor to lessee. *Id.* Under Plaintiffs' theory, one would expect that the granting clause would be conditional. Yet, ¶ 1 contains a broad and unconditional conveyance of oil and gas rights to the Lessee (Range):

> Lessor hereby grants and leases exclusively to Lessee all oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the Leasehold, ***together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure and market production from the Leasehold***, using methods and techniques which are not restricted to current technology, including the exclusive right to conduct geophysical and other exploratory tests.

(Docket No. 28-2 at ¶ 1 (emphasis added)). Of course, such grant of rights is limited to the

subsurface rights that the Lessor (Plaintiffs) actually own, as "Leasehold" is defined as the described property "containing 1700.485 acres, more or less, including all contiguous, appurtenant, submerged or riparian lands **_owned or hereinafter owned by Lessor_**," (*id.* at ¶ 2) and later specifies the portions of the subsurface oil and gas rights owned by the Lessor (i.e., thirty-three percent (33%) interest in the oil and gas in 1,332.485 acres of the property and a sixty-six percent (66%) interest in the oil and gas in the remaining 368 acres of the property). (Docket No. 30 at ¶ 10; 28-2 at ¶ 7). It is this Court's opinion, that through ¶ 1, the Lessor (Plaintiffs) conveyed all of the oil and gas rights in the property that they owned to Lessee (Range) and granted it the exclusive ability to drill and explore for same, authorizing the Lessee (Range) to use any methods or techniques necessary to do so.

In *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, (Pa. Super. Ct. 2013), the Superior Court interpreted a similar "exclusive rights" provision in an oil and gas lease, affirming the lower court's construction that the broad language contained in that lease granting the lessee all "exclusive rights" "necessary and convenient" to explore, develop and produce the oil and gas constituted not only a grant of oil and gas rights but also conveyed "with" such rights, the implied right to access the surface estate in order to explore for and extract such oil and gas below the surface. Notably, the provision in *Humberston* states that the lessee was granted the express rights to, among other things, access the surface, drill wells and conduct other surface level activities. *Id.* at 507. However, the Superior Court affirmed that both the implied rights afforded to the lessee under Pennsylvania law and the express terms of the lease permitted the lessee's surface activities which included building a freshwater impoundment for use during fracking operations. *Id.* at 512. In light of *Humberston*, which the Court finds persuasive, the Court interprets the granting clause in ¶ 1 as conveying all of the Plaintiffs' partial interests in

the oil and gas deposits to Range, which conveyance carries with it the implied interest vis-à-vis the surface owner to access the surface to explore and extract oil and gas.

As noted, the main area of dispute between the parties surrounds the interpretation of ¶ 4, which states that:

> Lessor and Lessee acknowledge and agree that Lessee is not granted any right whatsoever: (i) to drill a well on any portion of the surface of the Leasehold; or (ii) install, construct or locate access roads or pipelines on any portion of the surface of the Leasehold. Accordingly, any lands that have been pooled, unitized or combined with all or a portion of the Leasehold in accordance with the terms of this Lease shall bear the burden of all surface development. Lessor does, however, acknowledge and provide its consent to the possibility that a wellbore may pass through or terminate below the surface of the Leasehold as a result of slant or directional drilling operations originating from a surface entry on lands nearby or adjacent to the Leasehold.

(Docket No. 28-2 at ¶ 4). The Court finds that the plain meaning of ¶ 4 does not contain language sufficient for Plaintiffs to avoid the Lease.

The Court agrees with Range that the first clause in the provision does not, as Plaintiffs suggest, reserve any rights for Plaintiffs; rather, it is a limitation on the scope of the rights which have been conveyed to the Lessee (Range). (Docket No. 28-2 at ¶ 4). In other words, the parties agreed that the Lessor (Plaintiffs) did not expressly grant the Lessee (Range) any rights to either drill or set up other operations on the surface. (*Id.*). This should be uncontroversial as Plaintiffs themselves had no such express surface rights to grant to Range because they do not own the surface rights and never have – Stravaggi is the surface owner.[6] Further, the Lease is silent with

---

6     A leading treatise states the following:

> When the lessor does not own the surface of the premises leased or there is some question as to ownership of surface, a clause such as the following may be included in the lease:

> "In the event Lessee does not own the surface of the leased land, anything contained herein purporting to grant rights to lessee or reserve rights to Lessor

respect to whether the Lessor (Plaintiffs) retained any implied right to access the surface. But, the law of the Commonwealth is clear that the implied right to access the surface arises from and is attendant to the subsurface oil and gas rights. *See Humberston* 75 A.3d at 511. Hence, such implied rights arise by operation of law—not by agreement of the parties. (*Cf.* Docket No. 28-2 at ¶ 17 ("The entire agreement between Lessor and Lessee is embodied in this Lease and no implied covenant or liability of any kind or nature is created or shall arise by reason of this Lease or any provision contained thereof.")). Again, the Lease "grants and leases exclusively to the Lessee all oil and gas and their constituents." (Docket No. 28-2 at ¶ 1). Once production begins, these rights will ripen into a "fee simple determinable." *See Sabella*, 103 A.3d at 103. As the Lessor (Plaintiffs) granted and leased all of its oil and gas rights to Lessee (Range), the Plaintiffs' suggested retention of an implied right to access the surface at times when they possessed no subsurface rights would be contrary to Pennsylvania law. *See Pomposini v. T.W. Phillips Gas & Oil Co.*, 580 A.2d 776, 778 (Pa. Super. Ct. 1990) (citing 38 Am.Jur.2d, Gas and Oil § 94 (1968)) ("[a]ll rights claimed by the lessee that are not conferred in direct terms or by fair implication ... are to be considered as being withheld by the lessor."). Instead, the "one who has the right to remove subsurface minerals", i.e., the Lessee (Range), "also has the right to enter onto the surface and to make reasonable use of a portion of the surface to retrieve [its] property." *Humberston*, 75 A.3d at 511. Such implied rights are enforceable "as against the surface owner," i.e., Stavaggi. *Id.*

The Court believes that such interpretation of the first sentence of ¶ 4 is reasonable based

---

or to impose obligations on Lessor or Lessee, with respect to the surface, shall be deemed to be surplusage and of no force and effect except insofar as the right to the use of the surface is a part of the mineral rights and the mineral estate leased."

4-6 Howard R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 673.2 (2003 ed.).

on the plain meaning of the Lease and is fully consistent with Pennsylvania law. This sentence should be understood to mean only that the Lessee (Range) was not granted any express rights to access or use the surface estate by the Lessee (Plaintiffs). But, it cannot be read to exclude or restrict the Lessee (Range) from obtaining rights to access the surface elsewhere, i.e., by operation of Pennsylvania law and/or by obtaining access rights to the surface from third parties through separate agreements. The Court further finds that the only possible alternative construction of the first sentence would be that it constitutes a limitation on the scope of the conveyance of oil and gas rights set forth in ¶ 1, meaning that the Lessor (Plaintiffs) does not grant Lessor (Range) any rights (express or implied) in the surface estate. Yet, such a limitation would not undermine the validity of the Lease nor demonstrate that it is conditional on the type of drilling to be performed on the site and/or the location of any wells. *See American Leasing*, 454 A.2d at 559.

Moving on, Plaintiffs also rely heavily on the next sentence in ¶ 4 that "[a]ccordingly, any lands that have been pooled, unitized or combined with all or a portion of the Leasehold in accordance with the terms of this Lease **shall** bear the burden of all surface development," (Docket No. 28-2 at ¶ 4 (emphasis added)), to support their position that Range does not have a Lease authorizing drilling from the surface estate. Of course, this provision cannot be read without reference to the clause related to pooling and unitization, which contains broad language:

> Lessee is hereby granted the right, in its sole discretion, at any time and from time to time during and after the Primary Term, to pool or unitize all or any portion of the Leasehold with any other land or lands, whether contiguous or not contiguous, at any time before or after the drilling of a well so as to create one (1) or more drilling or production units.
>
> …
>
> Lessee is granted the right to change the size, shape and conditions

of any pool or unit created, however, any such change shall not affect the date upon which pooling or unitization occurred or is deemed to have occurred.

(Docket No. 28-2 at ¶ 12).   Thus, the Lessee (Range) was granted broad rights to act in its sole discretion to pool together any other property, at any time, to create a drilling production unit and to make all necessary changes to the size of the production unit. (*Id.*).   Considering these provisions together and applying the plain meaning of the terms contained therein, a reasonable interpretation of the second sentence of ¶ 4 becomes that the "production unit" "shall bear the burden of all surface development." (*Id.* at ¶ 12).

Here, the parties agree that Range has acquired leases with numerous third-parties and now controls one-hundred percent of the subsurface oil and gas rights, including the rights leased to them by Plaintiffs.   (Docket No. 30 at ¶¶ 18- 19).   They further concur that Range has obtained consent to drill on the surface of the property with the surface owner, Starvaggi, and all of the third party owners of subsurface oil and gas rights have likewise executed surface consent agreements.[7]  (*Id.* at ¶¶ 20-21).   Thus, Range has proceeded to pool all of the contiguous lands (surface rights and subsurface oil and gas rights) to create a production unit around this Leasehold.   Further, it is clear that the "production unit" – the pooled lands consisting of the surface estate and all of the subsurface oil and gas rights – can reasonably be said to be "bear[ing] the burden of all surface development." (Docket No. 28-2 at ¶ 12).

However, even if this sentence is read as a restriction on the Lessee's (Range's) use of the surface of the land given the use of the mandatory term "shall," Pennsylvania rules of contract interpretation would construe such restriction against Plaintiffs and would not support the Plaintiffs' enforcement of such restriction against Range in light of all the facts and

---

[7]       As is discussed in § V.C. below, Plaintiffs admit that they signed the surface consent agreements but claim that they were misled by the landman from Range in doing so.

circumstances. Under Pennsylvania law, restrictive covenants are interpreted with reference to generally applicable contractual principles. *See Vernon Twp. Volunteer Fire Dep't, Inc. v. Connor*, 855 A.2d 873, 880 (Pa. 2004).

> However, there is an important difference in the rule of interpretation as applied to restrictive covenants on the use of land. Restrictive covenants are limitations on a person's free and unconstrained use of property. They are not favored by the law, yet they are legally enforceable. As such, they are to be strictly construed against persons seeking to enforce them and in favor of the free and unrestricted use of property.

*Pocono Summit Realty, LLC v. Ahmad Amer, LLC*, 52 A.3d 261, 269 (Pa. Super. Ct. 2012) (internal citations and quotations omitted). Pennsylvania Courts will "enforce a restriction if a party's actions are in clear defiance of the provisions imposed by the covenant" [and] "where it is established that the restriction is still of substantial value to the owners of the restricted tract." *Vernon Twp.*, 579 Pa. at 375 (internal citations omitted). But, "a restrictive covenant may be discharged if there has been acquiescence in its breach by others, or an abandonment of the restriction." *Id.* at 376. To reiterate, Plaintiffs are seeking to enforce an alleged restriction on Range's use of the surface of land which they (Plaintiffs) do not own on a theory that they retained an implied right to access the surface of the property, despite their grant of all of their partial oil and gas rights to the Lessee (Range) in ¶ 1 of the Lease. Further, all other involved property owners (surface and subsurface) have consented to Range using the property. Under Pennsylvania law, the Lease should be interpreted in favor of Range's free and unrestrained use of the surface of the land rather than precluding such use. *See Pocono Summit Realty,* 52 A.3d at 269. It is also doubtful that Plaintiffs could enforce their claimed restraint due to the acquiescence of the surface owner and the cotenants in the subsurface oil and gas rights, all of whom have expressly agreed to Range's activities. *See Vernon Twp.*, 579 Pa. at 375-76.

The final portion of ¶ 4 likewise yields little assistance to Plaintiffs' proffered interpretation because this sentence includes only the Lessor's (Plaintiffs') acknowledgement and consent that a wellbore may pass through the surface estate as a result of slant or directional drilling operations set up on the surface of nearby or adjacent property.  (*See* Docket No. 28-2 at ¶ 4).   While there is no corresponding acknowledgement and consent regarding drilling operations set up on the surface estate, it would be counter to the aforementioned principles of contract construction and interpretation to read this language as creating any type of implied restriction on the Lessee's (Range's) use of the oil and gas estate.   And, the Lease itself precludes this Court from doing so.  (*Cf.* Docket No. 28-2 at ¶ 17 ("The entire agreement between Lessor and Lessee is embodied in this Lease and no implied covenant or liability of any kind or nature is created or shall arise by reason of this Lease or any provision contained thereof.")).   Instead, the language should be interpreted as meaning what it says, that the Lessor (Plaintiffs) acknowledges that the surface estate may be affected in the manner described in the Lease without precluding other, unspecified activities.

Additional provisions of the Lease support the Court's interpretation as they contain explicit references to drilling activities being conducted on the production unit.  For example, the "Notice" clause provides:

> Notwithstanding anything to the contrary contained in this Lease, this Lease shall not terminate or be subject to forfeiture or cancellation *if there is located on lands pooled, unitized, or combined with all or a portion of the Leasehold, a well capable of producing oil and/or gas, or on which Operations are being conducted* and, in that event, Lessor's sole remedy for any default under this Lease shall be damages.

(Docket No. 28-2 at ¶ 11 (emphasis added)).   Also, "operations" is defined in the Lease to include:

<u>any</u> of the following which may occur on lands pooled, unitized or combined with all or a portion of the Leasehold:

(i)      using bona fide good faith efforts to diligently prepare the surface of the physical well site area prior to the commencement of actual drilling activities including, but not limited to, the commencement of clearing operations on or adjacent to the well site area such as the removal of trees, the construction of access roads or the delivery of heavy equipment;

(ii)      drilling, testing, completing reworking, recompleting, deepening, sidetracking, stimulating, fracing, plugging back or repairing a well or equipment;

(iii)      any acts in search for or in an endeavor to obtain, maintain or increase the production of oil and/or gas including, without limitation, injecting substances into a well;

(iv)      the production of oil and/or gas;

(v)      the recovery of any injected substance; or

(vi)      any act or acts similar or incidental to any of the foregoing."

(*Id.* at ¶ 3 (emphasis added)).  Indeed, these provisions constitute further evidence of the parties' intent that: the production unit would consist of pooled lands, which the Lessee (Range) had full discretion to create; a well would be located at some point upon the surface of the production unit; and, exploration and drilling-related surface activities would necessarily take place in the same areas.

For these reasons, the Court finds that there are no genuine disputes of material fact and concludes that the Lease contains a broad, unqualified grant and lease of all of the Lessor's (Plaintiffs') rights in the subsurface oil and gas to the Lessee (Range).  (Docket No. 28-2 at ¶ 1). The scope of the granting clause is such that the Lease is neither contingent nor conditional as to the type of drilling or the ability of the Lessee to use of the surface to conduct exploration, drilling and/or surface operations.  *American Leasing*, 454 A.2d at 559 ("where an act or event mentioned in a contract is not expressly made a condition precedent, it will not be so construed unless such clearly appears to be the intention of the parties.").  There are also no terms in the

Lease which preclude the Lessee (Range) from obtaining the rights to access the surface from third parties, as was done here. Therefore, the Court overrules Plaintiffs' position that there is "no Lease" authorizing Range to conduct its exploration and drilling activities related to the oil and gas interests at issue in this lawsuit from the surface of the property.[8] Accordingly, the Court holds that the Lease controls the parties' relationship as to the oil and gas rights in the property.

### C. Parties' Cross Motions for Summary Judgment

Having interpreted the parties' Lease, the Court now turns to their competing motions for summary judgment. (Docket Nos. 28, 31). Range argues that the evidence is not sufficient to sustain an accounting claim under Pennsylvania law to the extent that the Plaintiffs seek either a legal accounting or an equitable accounting. (Docket Nos. 29, 38, 39). Range further maintains that Plaintiffs' accounting claim is precluded by the Lease which sets forth the royalties due to Plaintiffs resulting from any production of the oil and gas covered by the Lease. (*Id.*). In large part, Plaintiffs' position hinges on the Court's acceptance of their proffered interpretation of the Lease which has now been overruled in the preceding section of this Opinion. (*See* Docket No. 42 at 9 ("The Lease between Plaintiffs and Range does not apply under the facts and an accounting by the co-tenant is required.")). Plaintiffs also suggest that their request for an accounting is different than the legal and equitable accounting claims cited by Range and argue that they are seeking an accounting based on alleged fraud or misrepresentations by Range given the facts and circumstances surrounding their execution of the surface consent agreement. (Docket Nos. 37, 42, 45, 48). Overall, Plaintiffs contend that the Court should grant them an accounting and declare that Range must pay them a royalty equal to all of Range's gross

---

[8] The remainder of the parties' arguments, including the balance of the discussion which took place at the Motion Hearing, relate to the parties' performance of their duties and obligations under the Lease. In § V.D below, the Court describes why leave to amend to include a breach of contract claim will not be permitted.

revenues generated from any future sales of oil and gas from the production unit, proportionate to Plaintiffs' share of the oil and gas rights. (*Id.*).

A legal accounting under Pennsylvania law is permitted by operation of Pennsylvania Rule of Civil Procedure 1021(a) and "'is merely an incident to a proper assumpsit claim.'" *Pollock v. Energy Corp. of America*, 2011 WL 5977422, at *2 (W.D. Pa. Nov. 29, 2011) (quoting *Buczek v. First National Bank of Mifflintown*, 366 Pa. Super. 551, 531 A.2d 1122, 1123 (Pa. Super. Ct. 1987)). An action for "assumpsit" is "a common-law action for breach of such a promise or for breach of a contract." "Assumpsit", BLACK'S LAW DICTIONARY (9th ed. 2009). Hence, a legal accounting is a potential remedy for separate legal claims, such as breach of contract, trespass or conversion claims. *See Pollock*, 2011 WL 5977422, at *2. Pennsylvania courts have also recognized that "[a]n equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, or the plaintiff possesses an adequate remedy at law. Equitable jurisdiction does not exist simply because the petitioner desires information." *Rock v. Pyle*, 720 A.2d 137, 142 (Pa. Super. Ct. 1998) (citations omitted); *see also Centrix HR, LLC v. On-Site Staff Management*, 349 F. App'x 769, 775 (3d Cir. 2009). Further, "[t]he right to an accounting in equity usually depends on a previous demand and refusal." *Hohman v. Dabulski*, 2009 Pa. Dist. & Cnty. Dec. LEXIS 207 (Allegheny Cty. 2009) (citing 1A C.J.S. Accounting § 29). Yet, an equitable accounting claim should not be used as a vehicle to obtain information which would be subject to discovery in a separate civil action. *Pollock*, 2011 WL 5977422, at *2.

Plaintiffs have conceded their separate causes of action for which they possibly sought an accounting as a remedy, including their claims of conversion and trespass, and have not raised a breach of contract claim. (Docket Nos. 37, 42). Instead, they have repeatedly and consistently

stated that they are not arguing that Range breached the Lease. (*Id.*). Thus, there is no basis for a legal accounting. With respect to an equitable accounting, there is no fiduciary relationship between Plaintiffs and Range; rather it is contractual. (*See* Docket No. 28-2). It is also apparent that Plaintiffs have an adequate remedy at law – a claim for breach of the Lease – to the extent that they are seeking to enforce the terms and conditions thereof against Range. Plaintiffs did not make a previous demand for information which was refused – pursuant to the "Notice" provision of the Lease or otherwise. And, the facts are undisputed that "[w]ith the exception of the initial flow-back that is produced at the time Range completed the wells, neither well is currently producing oil and gas." (Docket No. 28-3, *Affidavit of Jeffrey P. Kramer* at ¶ 16). Aside from Plaintiffs' claim of fraud or misrepresentation, which is discussed below, there is no support in this record for traditional equitable accounting.

Despite this precedent, Plaintiffs rely on a series of older decisions by Pennsylvania courts cited throughout their briefs pursuant to which they contend that their accounting claim is different and may be maintained separate and apart from the types of accounting claims referenced above. (Docket Nos. 37, 42). But none of the decisions cited by Plaintiffs support the prosecution of a standalone accounting claim in the manner they are attempting in this case. To this end, *Foster et al. v. Weaver*, 12 A. 313 (Pa. 1888) was an action for trespass wherein the calculation of damages calculated thereon was determined to be a gross revenues method due to fraudulent behavior by the cotenant. Similarly, *McGowan v. Bailey*, 36 A. 325 (1897) involved a claim under a then-in effect statute referenced in the decision.[9] Finally, *Petition of Baily*, 76

---

[9]       The *McGowan* Court recounts that:

> The bill, evidently, from the averments and prayer, was framed under the act of April 25, 1850, which provides 'that in all cases in which any coal or iron ore, mines or minerals have been or shall be held by two or more persons as tenants in common, and coal, iron ore, or other mineral, has been or shall be taken from the same by any one or more

A.2d 645 (Pa. 1950) was a declaratory judgment action seeking declarations as to the parties interests in real estate and unpaid impounded royalties under an oil and gas lease.

Further, the legal principles articulated by Plaintiffs under which a gross revenues remedy has been permitted by Pennsylvania courts have been addressed in more recent oil and gas cases, but only in the context of the availability of this type of remedy for an underlying trespass cause of action. To this end, in *Sabella*, the Superior Court recounts that:

> the general framework for the computation of damages arising from a trespass distinguishes between innocent or good-faith trespasses and trespasses committed in bad faith. Stated broadly, when improvements to land are made by a good faith trespasser, the injured party is entitled, in effect, to the trespasser's net profits, i.e., the revenues generated upon the land less the moneys expended in facilitating the profitable activity. However, when a party trespasses in bad faith, the injured party is entitled to all moneys derived from the trespass without any offset for the cost of generating those moneys.

*Sabella*, 103 A.3d at 98. Again, the initially asserted trespass claim has been conceded by Plaintiffs and the *Sabella* court is addressing the availability of a damages remedy attendant to such a trespass claim.

The sole remaining basis for an accounting is the asserted misrepresentation by "Kevin" which allegedly induced Plaintiffs to sign the surface consent agreements. The Court agrees

---

of said tenants respectively, it shall be lawful for any one of said tenants in common to apply by bill or petition in equity to the court of common pleas of the county in which the lands lie, praying that an account may be decreed and taken of all coal, iron ore, or other mineral taken by said tenants respectively; and said court shall thereupon proceed upon such bill or petition agreeably to the course of a court of chancery, and shall have full power to make all orders that may appertain to justice and equity in the premises; and may cause to be ascertained, the quantity and value of the coal, iron ore, or other mineral so taken respectively by the respective parties, and the sum that may be justly and equitably due by, from and to them respectively, according to the respective portions and interests to which they may be respectively entitled in the lands.'

*McGowan v. Bailey*, 179 Pa. 470, 479, 36 A. 325, 326 (1897).

with Range that claims for fraud must be pled with specificity under Rule 9(b) of the Federal Rules of Civil Procedure and that Plaintiffs have not pled a fraud claim in their Complaint.[10]  *See Dongelewicz v. PNC Bank Nat'l. Ass'n.*, 104 F. App'x 811, 819 n.4 (3d Cir. 2004) (quoting *Williams v. New Castle County*, 970 F.2d 1260, 1266 n.4 (3d Cir. 1992)) ("'a contention in a brief' 'clearly … may not' be used to 'substitute for an allegation in a complaint.'").  As a consequence, the parties did not engage in written discovery[11] on the merits of such a claim and "Kevin" was never deposed.  (*See* Docket No. 49).  Even viewing the evidence in the light most favorable to Plaintiffs, as the Court must, *see Watson*, 478 F.3d at 147, the record does not support a claim of fraudulent inducement for a number of reasons.

Initially, "[t]he elements of fraud in the inducement are as follows: '(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.'"  *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005) (quoting *Skurnowicz v. Lucci*, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)).  Further, "the victim of fraud in the inducement has two options: (1) rescind the contract, or (2) affirm the contract and sue for damages."  *Id.* at 1184 (citations omitted).

Following these principles, even if Plaintiffs successfully convinced the Court that they were fraudulently induced into signing the surface consent agreements, their resulting options would not favor their position in this lawsuit or entitle them to summary judgment.  *See id.*  If the surface consent agreements were affirmed, Plaintiffs could possibly sue for damages under the

---

[10]     Plaintiffs' counsel suggested at the motion hearing that this argument may have been raised in a Reply to Range's Answer and affirmative defenses.  (Docket No. 49).  However, no such Reply was ever filed, nor was one required under the Federal Rules of Civil Procedure which only codifies the filing of an Answer to a counterclaim.
[11]     The Court notes that the period of fact discovery in this case was more than six months (i.e., from June 4, 2013 through December 13, 2013).  (*See* Docket Nos. 9, 24).

agreements, the consideration for which is noted on the documents as only $1.00. (*See* Docket No. 28-4 at 2 ("In consideration of the payment of One ($1.00) Dollar and in consideration of the premises set forth herein, the undersigned parties do hereby consent to ratify and approve the location of the well site(s), associated production equipment, access road(s) and pipeline(s) as indicated in the plat attached hereto")). On the other hand, if the surface consent agreements were rescinded, this Court's interpretation of the Lease controls such that Range is simply not precluded from obtaining the right to access the surface from third parties.

Next, in this Court's opinion, the facts and circumstances surrounding the execution of the surface consent agreements do not support a claim of fraudulent inducement as Plaintiffs have not proven that "Kevin" made any intentional misrepresentations to them. The alleged misrepresentations by "Kevin" included his statements that "everyone else" was signing the surface consent agreements – a fact which Plaintiffs must admit is true since they agree that Range obtained surface consent agreements from all of the interested owners of surface and subsurface rights throughout the production unit. Plaintiffs also believe that "Kevin" misrepresented that the surface consent agreements were a "mere formality" or did not change the context of the parties' relationship. It is doubtful that such statements could arise to the level of a material misrepresentation, absent some proof that "Kevin" did not believe them to be true or acted recklessly. *See Eigen*, 874 A.2d at 1185 (a representation must be "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false"). In addition, based on the Court's interpretation of the Lease, these assertions were simply not false; rather, they were more likely accurate because Plaintiffs granted Range exclusive rights to all of their oil and gas interests and via operation of Pennsylvania law, Range acquired the attendant implied right to access the surface estate and/or obtained the right to access the surface through its agreements

with third parties.

At most, Plaintiffs seek to invalidate the surface consent agreements based on their alleged misunderstanding or misapprehension of the terms contained therein. But, "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood." *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 25 (Pa. 2011) (quoting *Simeone v. Simeone*, 581 A.2d 162, 165 (Pa. 1990)). There is no allegation of any infirmity which would have prevented Plaintiffs from binding themselves to the agreements. They also expressed a general understanding that they were approving the well sites. Instead, it appears that what they claim they misunderstood[12] was that they could have withheld consent based on the position and interpretation of the Lease that they have taken in this litigation which – again, the Court has rejected.

Finally, Plaintiffs point to the fact that the surface consent agreements may have been

---

[12]     The Court notes that Plaintiffs maintain that the surface consent agreements contain insufficient language to amend the Lease and also violate the statute of frauds because such documents allegedly do not contain any Deed book references or page numbers, tax map numbers or any other specific identification of the parcels. (*See* Docket No. 36 at 5-6). "'The Statute of Frauds instructs that a purported transfer of an ownership interest in real property is not enforceable unless evidenced in writing and signed by the parties granting the interest.'" *Nolt*, 96 A.3d at 1047 (quoting *Long v. Brown*, 582 A.2d 359, 361 (1990)). Further, "'[a] writing required by the Statute of Frauds need only include an adequate description of the property, a recital of the consideration and the signature of the party to be charged.'" *Trowbridge v. McCaigue*, 992 A.2d 199, 201-02 (quoting *Hessenthaler v. Farzin*, 564 A.2d 990, 994 (1989)). Again, Plaintiffs admit that they executed the surface consent agreements and the initial Lease; hence, the statute of frauds was not violated for lack of execution by Plaintiffs. To the extent that Plaintiffs purport to challenge the written description, the Court disagrees that that the surface consent agreements are so defective. In this regard, the surface consent agreements clearly reference the Lease, identifying the parties, date and instrument number where it was recorded in Washington County. (*See* Docket No. 28-4 at 14 ("WHEREAS, the undersigned is the owner of property subject to that certain oil and gas lease executed by the Estate of David R. McWreath, Executors: Darlene C. McWreath and Robert C. McBride, …. To Fortuna Energy, INC. dated September 20, 2007 and recorded in instrument #200814687 of the Deeds Records of Washington County, Pennsylvania."). The referenced Lease sets forth the tax ID numbers of each of the parcels and denotes the Lessor's (Plaintiffs') percentage of interests in the oil and gas estate and is reasonably incorporated therein. (Docket No. 28-2). In addition, each of the attached plots showing the approved well locations denotes that Starvaggi is the surface owner/lessor and the record is undisputed that Starvaggi both owns the surface and a percentage of the subsurface oil and gas in these parcels. (*See* Docket Nos. 28-4 at 16-31). Plaintiffs are specifically referred to as "lessors" on the surface consent agreements, such documents state that the "lessors" are approving "McWreath Units #1H, #2H, #3H, #4H, #5H, #6H, #7H, #8H, #9H, #10H, #11H, #12H, #13H, #14H, #15H, and #16H well(s) attached hereto as 'Exhibit A,'" and the attached exhibits each state which of the well units are identified on the plots. (*Id.* at 14-31). Overall, the Court finds that the surface consent agreements do not violate the statute of frauds and correspondingly do not support the purported fraud in inducement claim.

improperly notarized as three of them apparently did not execute the agreements in the presence of the notary. (Docket No. 49 at 20-22). But, the purpose of having documents notarized is simply to later prove in court that they were signed, *see* 42 Pa.C.S. § 6105(a),[13] and the Plaintiffs all admit that they executed the agreements. In fact, Darlene McWreath admits that she met "Kevin" in person at her office and signed the documents in his presence after they "chitchatted" about the agreement. (Docket No. 34 at 53-58). The document clearly states that Kevin Mastrangello notarized the agreement. (Docket No. 28-4 at 2). He also initialed the date on the agreement by affixing "KMM" near the line where the date is noted. (*Id.*). Darlene McWreath then encouraged her siblings to sign the agreements and they all signed in due course. (Docket No. 34 at 52). Such facts are not indicative of fraud in the inducement.

Based on the foregoing, the Court finds that there are no genuine disputes of material fact as to the asserted accounting claim and will grant Range's motion for summary judgment and correspondingly deny Plaintiffs' motion for summary judgment.

### D. Leave to Amend

The last issue for the Court's consideration is Plaintiffs' assertion in their Supplemental Brief that they would seek leave to amend their complaint in order to add a claim seeking to invalidate the Lease. (*See* Docket No. 45). The sole basis for this contention is the alleged failure of the landman, (either employed by Fortuna or an agent thereof), who in 2007 presented Darlene McWreath and Robert McBride with the Lease but allegedly did not provide them with

---

[13]     Section 6105(a) provides that:

> The official acts, protests and attestations of all notaries public, certified under their respective hands and seals of office, including the dishonor of all bills and promissory notes, and of notice to the drawers, acceptors or endorsers thereof, may be received and read in evidence, as proof of the facts therein stated. Any litigant may be permitted to contradict by other evidence any such certificate.

42 Pa. C.S. § 6105(a).

a copy of a "Code of Conduct." (*Id.*). Such request must fail as it is both procedurally and substantively defective.

As explained above, the "Notice" provision of the Lease states that after "operations," have commenced on the production unit, including the drilling of a well, the "sole remedy" for default under the Lease would be damages. (Docket No. 28-2 at ¶ 12). Thus, a cause of action to invalidate or void the Lease is likely precluded by such provision. Additionally, other courts have interpreted an identical "Notice" provision as "requir[ing] that the lessors provide notice to the lessees prior to bringing any lawsuit asserting that the lessees have not met their obligations under the lease" or as setting forth a condition precedent which must be met prior to even filing a lawsuit. *See Stricklin v. Fortuna Energy, Inc.*, Civ. A. No. 5:12-cv-8, 2014 WL 2619587, *8 (N.D. W.V. Jun. 12, 2014). The purpose of the "Notice" provision is to provide the lessee sixty (60) days to respond and have the opportunity to cure any alleged breach. (Docket No. 28-2 at ¶ 12). Here, it is undisputed that Plaintiffs did not comply with the prerequisites in the Notice provision such that any breach of contract claim is premature. (*See* Docket No. 49).

Further, the Code of Conduct provision does not state that the Lease may be invalidated for failure to provide the Code of Conduct. (Docket No. 28-2). Instead, the Lease provision simply states that the Code of Conduct contains a dispute resolution mechanism which may be invoked to resolve any issue with presentation of the Lease. (*Id*). Hence, the Court is persuaded by Defendant's arguments that the failure to present the Code of Conduct to Plaintiffs, if proven, would not support a separate cause of action. (*See* Docket No. 46 at 8-11).

It also appears that such a claim would be barred by the four year statute of limitations which applies to the breach of contract claims. *See K.A.R. v. T.G.L.*, --- A.3d ----, 2014 WL 7331013, at *3 (Pa. Super. Ct. Dec. 23, 2014). "The statute of limitations begins to run as soon

as the time to institute a suit arises." *Id.* Because the failure to present the Code of Conduct

occurred in October of 2007 or more than five years before this lawsuit was initiated, the statute

of limitations would likely bar such claim. Aside from Fortuna's representative allegedly failing

to provide this document, Plaintiffs have not raised any problems with the initial presentation of

the Lease.

Regardless, the Court's established deadline for filing motions to amend pleadings (i.e.,

July 15, 2013) has long since passed as has the extended deadline for the completion of fact

discovery (i.e., December 13, 2013), without Plaintiffs formally seeking leave to amend or

attempting to establish "good cause" under Rule 16 which is required for the Court to permit

such amendment. *See Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 118 (W.D. Pa.

2010) (quotation omitted) ("once the pretrial scheduling order's deadline for filing motions to

amend the pleadings has passed, a party must, under Rule 16(b) demonstrate 'good cause' for its

failure to comply with the scheduling order before the trial court can consider, under Rule 15(a),

the party's motion to amend its pleading."); *see also Karlo v. Pittsburgh Glass Works, LLC*, Civ.

A. No. 10-1283, 2011 WL 5170445, at *2 (W.D. Pa. Oct. 31, 2011) (same).

This Court has denied several untimely attempts to amend pleadings in situations where

the parties had sufficient access to information to assert claims earlier in litigation. *See e.g.,*

*Graham*, 271 F.R.D. at 118; *Karlo*, 2011 WL 5170445, at *2; *Gaston et al. v. Sodexo*, Civ. A.

No. 14-76, Docket No. 25 (W.D. Pa. Jun. 25, 2014). The suggested amendment relies on

language set forth in a Lease that the Plaintiffs have had in their possession since 2007. Thus,

the same analysis precludes amendment here. Lastly, even if Plaintiffs cleared the Rule 16

"good cause" hurdle, this Court has the discretion under the Declaratory Judgment Act, 28

U.S.C. § 2201, to decline to exercise jurisdiction over any claim to the extent that a pure

declaration of the parties' rights and obligations under the Lease is being sought. *See e.g., Cabot Oil & Gas Corp. v. Jordan*, 698 F. Supp. 2d 474 (M.D. Pa. 2010); *Shychuck v. Chesapeake Appalachia, LLC, et al.*, Civ. A. No. 13-375, 2013 WL 2558161 (W.D. Pa. Jun. 11, 2013).

Accordingly, the Court finds that any potential amendment of the Complaint is untimely and otherwise would be futile such that leave to amend is denied.

VI. CONCLUSION

Based on the foregoing, Range's Motion for Summary Judgment [28] is GRANTED and Plaintiffs' Motion for Summary Judgment [31] is DENIED. An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge


Date:   January 26, 2015

cc/ecf:  All counsel of record.